Arthur L. SIMPSON

v.

UNITED STATES of America.

David E. SANDSTEDT

v.

UNITED STATES of America and
Stephen M. Gezovich.

Civ. A. Nos. 78–62, 78–103 Erie.

United States District Court,
W. D. Pennsylvania.

Jan. 22, 1980.

John R. Gavin, Oil City, Pa., for plaintiff Arthur Simpson.

Michael A. Fetzner, Erie, Pa., for plaintiff David Sandstedt.

John Paul Garhart, Erie, Pa., for United States.

Lowell T. Williams, Erie, Pa., for defendant Stephen M. Gezovich.

## OPINION, FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW

KNOX, District Judge.

### A. INTRODUCTION

This is a Federal Tort Claims Act suit brought to recover damages resulting from the alleged wrongful death of Susan Marie Simpson, plaintiff's decedent in 78–62 Erie, and for damages to the vehicle of David Sandstedt, plaintiff in 78–103 Erie, resulting from an almost head-on collision which occurred July 12, 1977. The collision occurred on U.S. Route 62, a two-lane highway in French Creek Township, Venango County, in the Western District of Pa. at approximately 9:50 p. m. The accident occurred a short distance immediately north of the crest of "Black Hill" when a southbound vehicle driven by Gezovich, then a Marine Recruiting Sergeant in Oil City, collided almost head-on with the vehicle driven by Sandstedt, northbound in its own proper lane on Route 62. As the result of injuries sustained in the collision, plaintiff's decedent, Susan Marie Simpson died a short time later and the Sandstedt vehicle suffered damages as hereinafter set forth. Thereafter plaintiffs filed administrative claims with the department of the Navy which were rejected and these suits followed. After a complete non-jury trial, held at Erie on September 18–20, 1979, and after consideration of the briefs and arguments of the parties, the matter is now ripe for adjudication. The court therefore makes the following:

### B. FINDINGS OF FACT

(1) Plaintiff's decedent, Susan Marie Simpson, born December 21, 1958, was a passenger in a 1974 Plymouth automobile owned by the U.S.A. and operated by Sgt. Stephen M. Gezovich on July 12, 1977, when said vehicle was involved in a collision with another motor vehicle operated by David E. Sandstedt.

(2) On July 12, 1977, Sgt. Stephen M. Gezovich was a member of the U.S. Marine Corps, Department of Navy, and an employee of the U.S.A.

(3) Prior to the accident, Gezovich was given possession of the said government vehicle by the defendant for use in connection with his duties as a recruiter for the U.S. Marine Corps, Department of Navy, Oil City, Pa.

(4) The collision occurred on U.S. Route 62, French Creek Township, Venango County, Pennsylvania, at approximately 9:50 p. m.

(5) Immediately prior to the accident, Stephen M. Gezovich was operating the said Plymouth in a southerly direction.

(6) Immediately prior to the accident Gezovich had been in the process of turning left across the northbound lane on the road-

way and perceiving he had made a mistake, attempted to turn back to the southbound lane, but was still in the northbound lane when the accident occurred.

(7) At the time of the accident, David E. Sandstedt was operating a 1974 Chrysler automobile in a northerly direction in the northbound lane on said roadway.

(8) The plaintiff's decedent, Susan Marie Simpson seated in the rear seat died as a result of the injuries which she sustained in the accident subject of this action.

(9) Following the accident, Sgt. Gezovich stated to James B. Catanzsarito, the investigating Pennsylvania State Police Officer, on three occasions that: "The accident was my fault." and "I made a bad turn.".

(10) At the time of the accident, in addition to Gezovich and Simpson, Mrs. Lori Silver, who was married to a member of the U.S. Marine Corps but separated, and Stephen H. Strickenbarger (Strickenbarger) were passengers in the government vehicle.

(11) Before being assigned to recruiting duty, Sgt. Gezovich had received a course of instruction regarding recruiting at the U.S. Marine base at San Diego, California.

(12) Sgt. Gezovich was instructed by his superiors that U.S. Marine Corps recruiting duty was a twenty-four-hour-a-day job.

(13) Sgt. Gezovich was instructed that he should acquire and keep in good graces and make "contacts" with young people well acquainted in the community, as sources for prospective recruits.

(14) Recruiting activities were frequently carried on in places serving intoxicating beverages and Sgt. Gezovich had not been instructed to refrain from recruiting duties in such places.

(15) Sgt. Gezovich had frequented, prior to the accident, bars and taverns with his superior officers for recruiting purposes.

(16) Other instructions and directives received by Sgt. Gezovich are contained in plaintiff Simpson Ex. A and Defendant Gezovich Ex. 1, 2, 3, 4 and 5.

(17) Sgt. Gezovich was permitted by his superiors to and did drive the said government vehicle, which was painted "Marine Green" and bore the U.S. Marine Corps emblem, back and forth daily from the Marine recruiting office in Oil City to his home in the Village of Cooperstown, a distance of approximately fifteen miles.

(18) On the day of the accident, Sgt. Gezovich considered both Strickenbarger and Silver good "contacts" because they had previously furnished him names of prospective recruits.

(19) At the time of the accident, Sgt. Gezovich considered that Susan Marie Simpson had possibilities as a prospective recruit.

(20) Sgt. Gezovich was assigned a monthly quota of recruits, male and female, that he was expected to enlist and on the day of the accident was behind in his quota since he had not enlisted anyone since the first of the month.

(21) On the afternoon of the accident, Strickenbarger stopped at Sgt. Gezovich's office in Oil City with a list of four prospective recruits but Gezovich was busy with other matters and told Strickenbarger he would see him later.

(22) Sgt. Gezovich closed his office at 9:00 p. m. and walked up the street to the Knight bar about a block away, where he met Strickenbarger, Silver and Simpson together with Mike Bowen a young man Gezovich had previously enlisted but who had not passed the "physical" because he was overweight.

(23) Gezovich discussed generally the Marine Corps with all four of those individuals while at the Knight bar.

(24) While at the bar, Gezovich inquired of Strickenbarger about the names of the four prospective recruits and Strickenbarger advised he had some further information regarding them at his home near Cranberry, Pa. and would get the information for him if Gezovich would drive him there.

(25) Silver asked Gezovich if he would drive her and Simpson to Silver's residence near Franklin.

(26) Gezovich agreed to take those individuals home since he wished to keep in favorable contact with Silver and Strickenbarger whom he regarded as valuable "contacts"; Strickenbarger had some information about the four prospective recruits, and Gezovich wanted the opportunity to have further conversation with Simpson in the event she might be a potential recruit.

(27) Gezovich testified he would not refuse to ride to Mrs. Silver because "she had helped me out a lot" in his recruiting duties and that he considered it beneficial to the Marine Corps to give all of his passengers a ride home.

(28) Stephen Strickenbarger corroborated the testimony of Sgt. Gezovich in that he had supplied in the past "leads" for Gezovich; on the night of the accident he was going to give Gezovich information regarding four individuals who might be interested in joining the Marine Corps; that he himself was considering enlisting in the Marine Corps; and that he needed a ride to his home.

(29) Gezovich was at Knight's bar less then one hour and departed with Strickenbarger, Silver and Simpson.

(30) The four went to the U.S. Marine Corps vehicle and drove to Franklin where they made a brief stop so Simpson could pick up some clothes.

(31) Sgt. Gezovich intended to take Silver and Simpson to Silver's residence south of Oil City and from there take Strickenbarger to Strickenbarger's home near Cranberry, Pennsylvania southeast of Oil City so he (Gezovich) could obtain the information regarding the four prospective recruits from Strickenbarger.

(32) Gezovich was proceeding south from Franklin via U.S. Route 62 and was enroute to Silver's residence at the time the accident occurred.

(33) At the time of the accident, Gezovich was dressed in his U.S. Marine Corps sergeant's uniform.

(34) In a companion case at Civil Action 78–103 Erie, Gezovich, a named defendant in the case, admitted at the time of the accident that he was on government business within the scope of his employment.

(35) The plaintiff's decedent, Susan Marie Simpson, was born December 21, 1958, and had graduated from Franklin Pennsylvania High School in June of 1977.

(36) At the time of her death, Miss Simpson was unmarried and in good physical health except for some asthmatic problems in very hot weather.

(37) Miss Simpson was a normal active female who appeared to enjoy life and her work.

(38) At the time of her death, Miss Simpson was employed as a Student Aid under a CETA program administered by the Mercer County Consortium Services, Inc. at the Venango County Pennsylvania Courthouse, earning $2.30 per hour. (Simpson Ex E & F)

(39) Dr. Reuben E. Slesinger, an economist affiliated with the University of Pittsburgh, testified that as of July 17, 1979, a nineteen-year old female high school graduate would have potential prospective lifetime earnings, less cost of maintenance reduced to present worth of $65,925.00 and that the same calculations for a college graduate would amount to the sum of $80,-795.00.

(40) The plaintiff proved the following expenses in connection with his claim:

| | |
|---|---|
| Funeral Bill | $1,764.00 |
| Gravestone | 717.00 |
| Grave lot | 165.00 |
| Total | $2,646.00 |

(41) The plaintiff, David E. Sandstedt, was operating his 1974 Chrysler in a northerly direction on U.S. Route 62 in French Creek Township, Venango County, Pennsylvania on July 12, 1977.

(42) The accident in question was caused solely by the negligence of Stephen M. Gezovich and there was no negligence on the part of David E. Sandstedt, which contributed to the cause of the accident.

(43) The damages to the plaintiff's vehicle were so extensive that it rendered the vehicle a total loss, said damages totalling $2,578.20.

(44) After the collision, the plaintiff ran over to the Government vehicle and while face to face with Sergeant Gezovich could not detect any odor of alcohol on his breath or any evidence of beer cans in the government vehicle.

(45) Trooper James Catanzsarito investigated the accident and then travelled to the Franklin Hospital to interview Sergeant Gezovich at which time he was unable to detect any odor of alcohol on the defendant's breath.

(46) There was evidence that some beer cans were found in an adjacent field after the accident but there is no showing of any connection between the beer cans and Sergeant Gezovich.

(47) At the time of the accident there were four occupants in the government vehicle: Stephen Gezovich, age 23, the driver, Lori Silver, age 20, a front seat passenger sitting *next* to Gezovich, Susan Simpson, age 18, a rear seat passenger sitting directly behind the driver and Stephen Strickenbarger, age 18, a rear seat passenger sitting on the far right.

(48) Miss Simpson survived the impact but died thereafter, prior to arrival at Franklin General Hospital.

(49) Gezovich's recruiting office was in Oil City, Pennsylvania. At the time of the accident his duty hours were from 9:00 a. m. to 9:00 p. m.

(50) The accident occurred at or near the Silver Home 2.1 miles south of the intersection of Route 8 and 62 or approximately 3½ miles west of Franklin. Strickenbarger resided near Cranberry, approximately 8 miles east and slightly south of Franklin near U.S. 322. The Route from the accident scene therefore runs on almost a straight line from west to east a distance of approximately 11½ miles.

(51) The court finds that Gezovich was taking Silver and Simpson to Silver's home and was then going to take Strickenbarger to his house near Cranberry to get further information as to the four possible recruits Strickenbarger had mentioned to Gezovich.

(52) The attempts by the government to show beer drinking during the course of the evening and in the car did not succeed. Such evidence did not rise by any means to a demonstration of unfitness to drive as required by Pennsylvania law, for evidence of intoxication to be brought into the case. This evidence, however, was also permitted as bearing upon the question as to whether Gezovich was on a frolic of his own and in violation of government regulations. The court holds that the government proof does not show a frolic of Gezovich's own, but that he credibly was engaged in attempting to secure recruits and information as to potential recruits for the Marine Service. As noted, his recruiting duties also included the securing of women marines. Any violation of the regulations that may have occurred as a result of having beer in the car (certain cans unopened, two cans opened) did not have any causal connection with the happening of the accident.

(53) Susan Marie Simpson was conscious for a short period of time following the accident. On response to a question as to whether she was injured, she said she was "Okay" and then laid her head back.

(54) Susan Simpson was conscious after the accident but died prior to arrival at Franklin General Hospital as the result of injuries sustained in the accident. The other three occupants were not seriously injured.

### C. DISCUSSION

These suits are brought under the Federal Tort Claims Act against the United States as defendant. Such suits are provided for in 28 U.S.C. § 1346 which provides as follows:

"(b) Subject to the provisions of Chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrong-

ful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

It is noted that this section is peculiarly applicable to this case where we have questions as to whether Gezovich was acting within the scope of his employment at the time of the accident and whether the United States, if a private person, would be liable to claimant in accordance with Pennsylvania law.

We must therefore approach determination of this case in the same manner as we would approach an ordinary accident on a Pennsylvania highway to determine liability.

### 1. Liability of the driver.

■ It is clear from 1346(b), supra, that the determination of the driver's negligence as being the proximate cause of this accident is a question which must be decided under Pennsylvania law. It is the law in Pennsylvania that in wrong-side-of-the-road accidents where, as here, defendant is on the wrong side of the road at the time of impact, negligence can be inferred unless the defendant can explain his presence in the wrong lane. I. e., the burden is upon the defendant to show that he got upon the wrong side of the highway at the time of the accident through no negligence on his part. See *Campbell v. Fiorot*, 411 Pa. 157, 191 A.2d 657 (1963); *Fair v. Snowball Express Inc.*, 226 Pa.Super. 295, 310 A.2d 386 (1973); *Keba v. Picket*, 434 Pa. 148, 252 A.2d 675 (1969).

In the instant case, Sgt. Gezovich did attempt to explain his presence on the wrong side of the road by saying he did not know where the driveway to the Silver house was, that he made a turn at the wrong place and realized this was not the driveway and swung back trying to get onto his own side of the road. He was still in the wrong lane when he was struck by the Sandstedt car which came over the crest

of a hill. The Sandstedt car was on its own side of the road with the driver keeping proper observation ahead and proceeding at a reasonable rate of speed. The explanation given by Sgt. Gezovich is only further evidence of his negligence in getting on the wrong side of the road under these circumstances. We therefore have no hesitation in holding that Gezovich was negligent and this negligence was the proximate cause of the accident.

### 2. Contributory Negligence.

■ Upon review of the evidence, the court is unable to determine any basis upon which to make a finding that either the decedent Susan Simpson in 78–62 Erie or David Sandstedt the driver and plaintiff in 78–103 Erie were in any way to blame for this accident. Susan Simpson was riding as a guest passenger in the left rear seat of the car and had no control over its operation. The driver owed her a duty of ordinary care. Under these circumstances, we find no contributory negligence on the part of plaintiff decedent in 78–62 Erie or on the part of Sandstedt as plaintiff in 78–103 which would bar or reduce recovery.

### 3. Liability of the United States for acts of Gezovich.

■ Having found Sgt. Gezovich was guilty of negligence which was the sole proximate cause of the accident, we next turn to the question of whether the United States is liable for his conduct. Again, turning to 28 U.S.C. § 1346(b), supra, we find that the government is liable if the employee is acting within the scope of his office or employment under circumstances where the United States as a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. While it might be argued that this act sets up a federal law of vicarious liability on the part of the United States for the acts of its employees, actually it says no more than that Pennsylvania law is to be applied. This was so held by the U.S. Supreme Court in *Williams v. U. S.*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955) vacating the judgment of the Ninth

Circuit in 215 F.2d 800 (9th Cir. 1954). The U. S. Supreme Court in this per curiam opinion plainly stated: "This case is controlled by the California doctrine of respondeat superior." By the same token, we hold that the instant case is governed by the Pennsylvania doctrine of respondeat superior.

■ There is a long line of Pennsylvania cases holding as set forth in *Sefton v. Valley Dairy Company*, 345 Pa. 324, 28 A.2d 313 (1942) that: "It is well settled by our previous decisions that the presence of a defendant's name on a commercial vehicle raises a rebuttable presumption that the vehicle is owned by defendant and that the driver of the vehicle is a servant of defendant acting within the scope of his employment," citing numerous cases including *Hartig v. American Ice Co.*, 290 Pa. 21, 137 A. 867; *Sieber v. Russ Bros. Ice Cream Co.*, 276 Pa. 340, 120 A. 272. The defendant argues that this is a question of presumptions which are matters of procedure for the federal court. We noted that the Pennsylvania courts only treat this as a rebuttable presumption, i. e., as a basis for an inference. In the instant case, the mere fact that the Marine Corps insignia was inscribed on each side of this government-owned car operating with a government license plate justifies an inference that the operator was driving as an employee within the scope of his employment. In addition, we have the other factors: Sgt. Gezovich was in full dress Marine Sergeant's Uniform, the car bore U.S. Government license plates, and Gezovich had a government driver's license. All these facts taken together are sufficient to raise a rebuttable inference that Gezovich was on government business as an employee within the scope of time of the accident. The court holds that the evidence produced by the government is not sufficient to wipe out this inference.

The presumption above referred to has been applied by Judge Gourley of this court in *Caldwell v. Wilson Freight Forwarding Co.*, 322 F.Supp. 43 (W.D.Pa.1971) involving a presumption arising from a name on a tractor trailer. It appears that no Pennsylvania court has applied this presumption to an ordinary passenger automobile which is not being used for commercial purposes.

The facts in this case would seem to place it in the category of commercial motor vehicle cases since it was a U.S. Government car bearing a government license plate and with Marine Corps insignia decals on each side. However, we do not have to apply a presumption since the court has held that there is an inference that the vehicle was being used on government business and that the government has produced insufficient evidence from which we can infer otherwise.

Under the Pennsylvania law of respondeat superior, when we are dealing with a passenger vehicle used on government business, we must consider the totality of all the circumstances of the case. *Winward v. Rhodewalt*, 203 Pa.Super. 369, 198 A.2d 623 (1964). In such a situation Pennsylvania applies the principles set forth in section 228 of Restatement 2d of Agency as set forth at 198 A.2d page 624 of *Winward*, supra, as follows:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) *it is actuated at least in part*, by a purpose to serve the master and

(d) if force is intentionally used by the servant against another the use of force is not unexpectable by the master

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits or too little actuated by a purpose to serve the master.

These were the tests applied by Judge Gourley in *Kemerer v. U. S.*, 330 F.Supp. 731 (W.D.Pa.1971), in which he said at 733:

"It appears to this court that whether Gilg's conduct was within the scope of his employment such that the defendant is

liable therefor depends on the following factors:

1. Was the conduct engaged in the kind for which Gilg was employed to perform;

2. Did the accident occur substantially within authorized time and space limits; and

3. Was the conduct taken actuated, at least in part, by the purpose of serving the employer.

"An affirmative answer to these questions compels the conclusion that Gilg was acting within the scope of his employment and that the defendant would be liable for damages caused by Gilg's negligent operation of his automobile. It must be remembered that no single factor determines whether or not a person is acting within the scope of his employment; the totality of the circumstances must be considered. *Winward v. Rhodewalt*, 203 Pa.Super. 369, 198 A.2d 623 (1964). In this regard, it has been established and stipulated to by counsel that Gilg was on constant travel status and that he received mileage allowance for use of his car. In effect, Gilg had no precise time limitations. His use of the Monroeville Post Office was known to and authorized by his superiors. Thus he would have been within required 'space limits' in so acting. Because Gilg's presence was required at various conferences and conventions, the view of this court is that he was engaging in the kind of work for which he was employed and it was actuated by a desire to serve the government, at least in part. Even though the cut-off time on his travel voucher was recorded as terminating at 6:30 p. m., September 10, 1968, and the accident took place some three hours thereafter, he was in fact pursuing the interests of the government by mailing his letter of complaint to the hotel. Moreover, the fact that Gilg also intended to purchase a magazine on his trip; or that he had had dinner interspersed between his business endeavors does not vitiate the agency relationship or the fact that he was acting within the scope of his employment. *Anzenberger v. Nickols* [413 Pa. 543, 198 A.2d 309], supra."

It will be noted that in the *Kemerer* case the government employee driving his own car was on his way to mail a letter which arguably concerned business matters in which the government was interested.

The government contends that Gezovich was on a frolic of his own referring to the presence of beer cans in the car, beer cans in the field and two women whom he was taking home before going to Strickenbarger's home to get further information about possible recruits. The evidence, however, shows that Gezovich was engaged in recruiting not only male but also female marines, that he thought Simpson was a likely recruit and that Lori Silver was a valuable contact who had previously given him names of prospects for marine recruiting. We, therefore, find that he was in the scope of his employment at least in part, performing duties furthering the interests of the government in recruiting marines. In view of the problems the government has had with securing volunteers to serve in the armed forces, it is necessary to explore every lead and keep up all possible contacts if the effort is to succeed.

Since we have held that Gezovich was acting in the scope of his employment at the time of the accident, he is therefore relieved from liability and the remedy of the plaintiff is exclusively against the United States under 28 U.S.C. § 2679(b) which reads as follows:

"(b) The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property or personal injury or death, resulting from the operation by an employee of the government of any motor vehicle while acting within the scope of his office or employment, shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or his estate whose act or omission gave rise to the claim.

See Ex. A in Simpson case as to instructions for recruiting.

In view of the above, we will enter judgment in favor of the plaintiff in both cases against the United States and enter judgment in favor of Gezovich in the suit wherein he is a defendant 78–103 Erie.

### 4. Damages.

■ It will be noted that under 28 U.S.C. § 1346(b) supra, the government is liable in a case such as this for money damages for personal injury or death caused by the negligent or wrongful act or omission of an employee of the government while acting within the scope of his office or employment, where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. The government claims that the testimony of the plaintiff's expert, Dr. Slesinger, should be stricken as it is too speculative and it imposes upon the government a greater amount of damages than it would be liable for under 28 U.S.C. § 2674.[1] It is clear that this act cuts out liability for interest prior to judgment and also cuts out punitive damages particularly in a death case where the state law provides for damages only punitive in nature. Pennsylvania, however, does not so provide but provides for actual or compensatory damages. On behalf of the decedent, Susan Simpson, we have two causes of action, a survival action and a wrongful death action. We will deal with the wrongful death claim later. Under Pennsylvania law, in a survivorship action, the administrator, the plaintiff herein, is entitled to recover the decedent's lifetime prospective earnings less personal maintenance expenses plus compensation for pain and suffering. See *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971). 20 Purdon's Pa. Stats. § 3371. The court sees no reason why the usual Pennsylvania rule should not be applied in this case. The court agrees with the government and with Dr. Slesing-

er that the decedent's academic standing of number 221 out of a class of 248 and her past scholastic performance in general indicated little chance that she would enter college or graduate therefrom. Therefore, the damages should be confined to loss of earnings to date, plus damages for the prospective earnings for a female high school graduate. According to Dr. Slesinger, when reduced to present worth this amounted to $65,925. Dr. Slesinger, however, admitted that he made an error with respect to working life after re-entry into the labor market, i. e., after having married and reared children. The government agrees that the Slesinger figures should thus be reduced from $65,925 to $52,740. Dr. Slesinger further admitted that there was only a 50/50 chance that had she lived, she would have re-entered the labor market at 35 after a second child entered school. There is included in the $52,740 figure the sum of $3309 representing lost earnings to date, thus giving a figure of $49,431 for loss of future earnings less expenses. This figure should therefore be cut in half to the figure of $24,715.50 which, plus $3309, gives total damages of $28,024.50 for loss of earnings.

With respect to pain and suffering, the evidence is that Miss Simpson, when queried after the accident said she was okay and then laid her head back. She was found dead upon arrival at the hospital as the result of the accident. It appears she suffered internal injuries which caused her death. We will, therefore, allow the figure of $2500 which we find to be just compensation for pain and suffering prior to death making a total award to the Simpson estate of $30,524.50 in the survivorship action.

### 5. Wrongful Death.

In the wrongful death action the plaintiff is entitled to the funeral expenses which, under finding of fact 41, total $2646.00.

---

1. "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

"If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively for whose benefit the action was brought, in lieu thereof."

The government claims that no administrative claim was made to the government for wrongful death.

 Undoubtedly the filing of an administrative claim is prerequisite to bringing this action. See 28 U.S.C. § 2675. The purpose of the administrative claim requirement is to ease congestion in the courts and avoid unnecessary litigation, to afford the government an opportunity to investigate and expedite the fair administrative settlement of tort claims. See *Executive Jet Aviation Inc. v. U. S.*, 507 F.2d 508 (6th Cir. 1974).

In this case, the claim, copy of which is attached to the government's brief, was for a sum certain and did state a claim for injuries from the collision resulting in death. It did not state whether it was a wrongful death claim or a survivorship claim. The court does not perceive the necessity for imparting requirements of English common law pleading to an administrative claim filed under the Federal Tort Claims Act as long as the purposes of the requirement are fulfilled. Here, the claim as filed provided the government with fair notice and a chance to investigate and make a settlement. Therefore we hold the claim is sufficient as filed for both wrongful death and survival claims. See *DeGroot v. U. S.*, 384 F.Supp. 1178 (D.C.Iowa 1974) and more recently *Dillon v. U. S.*, 480 F.Supp. 862 (D.C.S.D.1979).

### D. CONCLUSIONS OF LAW

(1) On July 12, 1977, at the time of the accident which is the subject of this action, Stephen M. Gezovich was acting within the scope and course of his employment as a United States government employee.

(2) The sole and proximate cause of the accident was the negligence of Sgt. Gezovich in the operation of the United States Government vehicle.

(3) The defendant, the United States of America is liable to the plaintiff for damages as provided by Pennsylvania law to wit, 20 Pa.C.S.A. § 3371 et seq. and 12 P.S. § 1601.

(4) Pursuant to the Pennsylvania Survival Act, 20 Pa.C.S.A. § 3371 et seq., the court finds and awards judgment in favor of the plaintiff in the amount of $30,524.50.

(5) Pursuant to the Pennsylvania Wrongful Death Act, 12 P.S. § 1601, the court finds and awards judgment in favor of the plaintiff in the amount of $2,646.00.

(6) Neither of the plaintiffs was guilty of contributory negligence which contributed to the injuries and damages sustained in a proximate way.

(7) The defendant Gezovich is not liable to plaintiffs under 28 U.S.C. § 2679.